### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### Case No. 21-23396-Civ-COOKE/O'SULLIVAN

JOSE ALEXANDER DA SILVA ASCANIO,

      Petitioner,

v.

MERY ALEJANDRA DIAZ CRESPO,

      Respondent.

_____/

### ORDER ON PETITION FOR RETURN PURSUANT TO THE HAGUE CONVENTION

On September 22, 2021, Jose Alexander Da Silva Ascanio ("Petitioner" or "Ascanio") filed a verified petition under the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, reprinted in 51 Fed. Reg. 10,494 (March 26, 1986) (the "Convention"), and its implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001 *et seq.* In his petition, Ascanio requests the return of his two daughters, whom the Court will refer to as S.D.S. and A.D.C., to Portugal. Ascanio alleges that S.D.S. and A.D.C. have been wrongfully removed and retained by Respondent, Mery Alejandra Diaz Crespo ("Respondent" or "Crespo"), his wife and the mother of both children. The Court conducted a multi-day evidentiary hearing during which Petitioner and Respondent gave evidence. Both Parties also called, as witnesses, their respective Portuguese attorneys. Respondent also called S.D.S.'s teacher in Portugal to give evidence.[1] At Respondent's request, the Court interviewed S.D.S. *in camera* and on the record, but outside the presence of the parties and their respective counsel.

After careful consideration of the Parties' submissions, testimony, and arguments, the Court **GRANTS** the Petition. The foregoing constitutes this Court's findings of fact and conclusions of law.

---

[1] Respondent initially filed a motion requesting an order from this Court directing S.D.S.'s therapist to testify. That request was subsequently withdrawn.

I.    BACKGROUND

   A. **The Parties' Relationship and Family Life**

Ascanio and Crespo, who met in Venezuela, are married and have been married since November 2011.  After their marriage in Venezuela, they welcomed their first child, S.D.S., in Venezuela in March 2013.  The Parties remained in Venezuela until 2017, when they moved to Thailand.  The family moved to Thailand because Ascanio secured a job there. However, approximately fourteen months after they moved, the company for which Ascanio worked ceased operations, and the family had to leave Thailand.  Before Ascanio lost his job, they had been working on securing S.D.S.'s Portuguese citizenship through Ascanio's Portuguese citizenship.  Because they could not return to Venezuela to complete the process, they sought permission to complete the process in the United States.  Upon confirmation that this was permissible, the family came to Miami in January 2018, where they stayed with Crespo's parents until May 2018.

During their time in Miami, Petitioner continued to search for jobs.  He applied to, or searched for, jobs in Portugal, Hong Kong, and Venezuela.  Ascanio's job search was unsuccessful; hence, the family made plans to relocate to Portugal, where Ascanio's parents and four siblings live.  Accordingly, in May 2018, after their stay in Miami, the family moved to Portugal and remained there until the events that led to this proceeding.  Both Ascanio and Crespo held jobs while they resided in Portugal, albeit not at all times.  Crespo obtained a driver's license in Portugal.  Their older child, S.D.S., attended school and took ballet classes in Portugal.  Crespo and S.D.S. also attended church in Portugal.  Sometime in 2020, Crespo became pregnant.  She subsequently registered for and was receiving a prenatal bonus for her pregnancy in Portugal.

The relationship, it appears, had been increasingly going awry for some time, and amid allegations of infidelity and domestic abuse, the marriage disintegrated over the past year. Although they still lived together, Petitioner initiated divorce proceedings in Portugal, which the Parties continue to be engaged in.  They are both represented by attorneys there.  There is also a parental responsibilities action in progress.  That action will determine custody rights and arrangements between the parties.

### B. Allegations of Domestic Violence and Abuse

According to Respondent, the marriage was, and had been for some time, marred by abuse.  Respondent testified that Petitioner frequently expressed his anger both verbally and physically.  She stated that Petitioner would grab her by the arm and hair, push her against the wall, and hit her head against the wall.  Respondent also testified that Petitioner subjected her to sexual abuse, frequently forcing himself on her.  She testified that Petitioner would also force her to have oral, vaginal, and anal sex with him, and that some of the sexual abuse caused physical injuries.  On the occasions she was able to successfully refuse his forceful advances, she further testified, Petitioner would not speak to her.  He would leave the house and threaten to have sex with other women.  Respondent also testified that some of the abuse occurred while she was pregnant, and that on some occasions, the physical abuse occurred in the presence of their older child, S.D.S.  Respondent also testified that, on one occasion when she refused Petitioner's sexual advances, he kicked her out of the house and threw her clothes on the floor.

Respondent testified that Petitioner was also physically violent with S.D.S.  According to Respondent, Petitioner once cut S.D.S.'s hair when she got lice from school.  He reportedly also yanked out a portion of her hair.  Respondent also testified that Petitioner once grabbed S.D.S., pressed her against a bed, and squeezed her because he was annoyed by her fidgeting during online school.  According to Crespo, Petitioner was generally controlling and threatening during their marriage, including policing her whereabouts and use of electronic devices.  There is a pending domestic violence action against Petitioner in Portugal based on the reports made by Respondent.  A submitted police report names S.D.S. as a victim.

Petitioner denied all allegations of domestic abuse against his wife and daughter, describing them as false.

### C. Respondent's Departure from Portugal

According to Respondent, after another incident of domestic violence at their home on March 29, 2021, Respondent contacted the proper authorities to report the incident.  She scheduled a call with a representative to coincide with a doctor's appointment where she knew her husband would not be present.  At her doctor's appointment, she spoke with the representative about her situation.  On March 30, 2021, Respondent and S.D.S. were taken

to a shelter for victims of domestic violence.  There, her phone was reset, and she was given a new email address.

Crespo came to believe that Ascanio had discovered where she was while she was at the shelter.  It is unclear if Petitioner knew Crespo's exact location.  However, Petitioner testified that on one of the occasions when he went to the police station to report the family missing or his daughter as abducted—about five or six days after Crespo and S.D.S. left the home—he was told there that Crespo was at a shelter for victims of domestic violence.  In any event, Crespo informed the shelter of her belief that Ascanio knew where she was.  The shelter later documented this information in May 2021.[2]  Ascanio sent Crespo at least two emails asking if she, S.D.S., and the unborn child were doing alright, and if Crespo needed financial assistance.  These emails were sent to Crespo after she had been provided new contact information at the shelter.   She no longer had access to her previous email address, so she never saw the messages.

While she was at the shelter, she sought assistance with obtaining a Portuguese passport.  Crespo became a naturalized citizen in November 2020.  The shelter helped her obtain a passport and Crespo's parents subsequently purchased plane tickets for Crespo and S.D.S.  They flew first to the Dominican Republic, where they quarantined for 15 days before they came to the United States.

Respondent and S.D.S.'s arrived in Miami on April 25, 2021.  The Court was informed that their visas expired on October 24, 2021.  While the Court is unaware of their current immigration status, that information is of no moment to the Court's analysis.   After her arrival, Respondent sought a restraining order against Petitioner in Florida.  The request was granted but the order was not served on Petitioner.  The couple's second child, A.D.C., was born on June 16, 2021 in the United States.  Her father is not identified on her birth certificate.  Petitioner was subsequently provided with a Portuguese translation of A.D.C.'s Florida birth certificate.

---

[2] The Parties extensively argued against the admittance of this document at the evidentiary hearing, even though it was not admitted into evidence.  The Court now clarifies that testimony from this document was accepted as an indication of Crespo's state of mind regarding the compromise of her location.

## II.   DISCUSSION

Petitioner alleges that Respondent wrongfully removed and retained both children and he now seeks their return under the Convention.   *See* Verified Pet., ECF No.1.   The Convention was adopted "[t]o address the problem of international child abductions during domestic disputes."   *Lozano v. Montoya Alvarez*, 572 U.S. 1, 4 (2014) (internal citations and quotations omitted).   "The Convention states two primary objectives: 'to secure the prompt return of children wrongfully removed to or retained in any Contracting State,' and 'to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'"   *Id.* (quoting Hague Convention, art. 1).   "It is the Convention's core premise that 'the interests of children . . . in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'"   *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020).   "To that end, the Convention ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides."   *Id.*

Accordingly, when a petition under the Convention is filed, the first question a court must address is whether the removal or retention was wrongful.   A removal or retention is wrongful if it: (i) violates one of the parent's custody rights provided by the laws of the child's country of habitual residence; and (ii) the parent was actually exercising those custody rights at the time of removal or retention, or would have been exercising them, but for the removal or retention.   Hague Convention, art. 3.   As applied here, to establish a *prima facie* case of removal or retention, Ascanio must establish by a preponderance of the evidence that: (i) both children were habitual residents of Portugal before the removal or retention; (ii) that the removal or retention was in breach of his custody rights under Portuguese law; and (iii) that he was exercising those rights at the time of the removal or retention, or that he would have been exercising those rights but for the removal or retention.   *Id.* art. 3(b).

### A.   PETITIONER'S *PRIMA FACIE* CASE

#### 1. Habitual Residence

Neither the Convention nor ICARA defines "habitual residence", but it is understood that the relevant period is the time immediately before the removal or retention.   *See Fuentes-Rangel v. Woodman*, 617 F. App'x 920, 921 (11th Cir. 2015).   A child's habitual residence is the place the child "has been physically present for an amount of time sufficient for

acclimatization," and "which has a degree of settled purpose from the child's perspective." *Pesin v. Osorio Rodriguez*, 77 F. Supp. 2d 1277, 1284 (S.D. Fla. 1999).   "For older children capable of acclimating to their surroundings, courts have long recognized, facts indicating acclimatization will be highly relevant." *Monasky*, 140 S. Ct. at 727.  Where especially young children are concerned, however, the parents' conduct, intentions, and agreements during the time period preceding the removal or retention are "relevant considerations." *Id.*

Importantly, the determination of a "child's habitual residence depends on the totality of the circumstances specific to [each] case." *Monasky*, 140 S. Ct. at 723.  "No single fact…is dispositive across all cases." *Id.* at 727.  It is a "fact-driven inquiry," and "courts must be sensitive to the unique circumstances of the case and informed by common sense." *Id.*  With this legal framework in mind, the Court considers whether Petitioner has met his burden of establishing that Portugal was the habitual residence for both children.

### a. **S.D.S.'s Place of Habitual Residence**

S.D.S. was a habitual resident of Portugal at the time of removal.[3]  S.D.S. lived in Portugal from May 2018 through March 2021.  When the family left Thailand and could no longer return to Venezuela, they came to the United States for a short time.   After accomplishing the purpose of their trip to the United States, they moved to Portugal, given Petitioner's ties there.  At some point after they arrived in Portugal, the family rented an apartment where they lived with S.D.S. S.D.S. attended school and took ballet classes in Portugal.  Although she was struggling with Portuguese, her teacher testified that she was placed in a class to assist her with learning the language.  She attended church in Portugal and had members of her father's family with whom she had a relationship.

Respondent testified that the intention was never to remain in Portugal permanently, and that the family would have moved again if Ascanio had secured another job elsewhere. Ascanio denies that he would have moved the family, despite their move to Thailand.  He testified that he was looking for commuting piloting jobs, which would have allowed him to work in a different country for short periods of time and then return home.  Whether or not Ascanio would have moved the family to another country before the move to Portugal, or

---

[3] Although the Respondent's answer to the Petition does not meaningfully quarrel with S.D.S.'s habitual residence being Portugal, closing arguments and elicited testimony suggests that Respondent disagrees that Portugal was S.D.S.'s habitual residence before the removal.

from Portugal to another country, is not quite relevant to the issue of habitual residence. Relatedly, the intention, or lack thereof, to remain in a place *permanently* is not required for a finding of habitual residence. Indeed, habitual residence may be established even when a move is indefinite or for a limited period.

Instead, the Court is concerned only with what evidence reflects that Portugal was S.D.S.'s habitual residence at the time immediately before the removal. And, on the record before it, the Court finds that Petitioner has established by a preponderance of the evidence that Portugal was S.D.S.'s habitual residence immediately before the removal. She had been psychically present in Portugal for over two years, and there, she attended school, church, and ballet classes. She also had a relationship with her father's family in Portugal.

a. **A.D.C.'s Place of Habitual Residence**

The Court also finds that Petitioner has established, by a preponderance of the evidence, that A.D.C.'s place of habitual residence is Portugal. Determining the habitual residence of an infant who is too young to have acclimatized to any one place can be an arduous exercise. In such cases, however, "the intentions and circumstances of caregiving parents are relevant [and important] considerations." *Monasky*, 140 S. Ct. at 727. While the Parents' shared intent is not dispositive on the issue of habitual residence, here, the Court finds that it offers persuasive evidence to support a finding that Portugal is A.D.C.'s habitual residence. *See id.* ("[F]acts indicating that the parents have made their home in a particular place, can enable a trier to determine whether an infant's residence in that place has the quality of being 'habitual.'").

Here, the Parties made Portugal their home in 2018. Crespo and Ascanio had an account where a prenatal bonus for Crespo's pregnancy with A.D.C. was being deposited. Crespo also had a doctor in Portugal monitoring her pregnancy. The family had just moved to a new apartment days before Crespo was moved to a shelter. Although Respondent testified that she did not wish to move to the new apartment, and that she was forced to sign the new lease, she did not object to staying in Portugal. Indeed, she testified that she asked to stay with S.D.S. in the older apartment.

The Court acknowledges the oddity of a conclusion that a child born in the United States is a habitual resident of a country she has never been in. Nevertheless, it is well-established that a newborn's place of birth does not automatically bestow upon that child a

habitual residence.  *See id.* at 722.   Considering the totality of the circumstances presented here, the Court concludes that Petitioner has established that Portugal is A.D.C.'s habitual residence.

### 2. Breach of Custody Rights

The Court also finds that the children's removal and retention breached Petitioner's custody rights under Portuguese law.  A right of custody under the Convention includes "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."  *See* Hague Convention, art. 5.  Ascanio is S.D.S.'s father, and he has lived with, and shared custody of, S.D.S. with Crespo since S.D.S.'s birth.  As a child born during the marriage between the Parties, Ascanio is considered A.D.C.'s father under Portuguese law, granting him custody rights until a court rules otherwise.  Ascanio has rights relating to the children's care.  He also has a right to determine where the children reside. The Court therefore concludes that Petitioner has met his burden of establishing this element of his *prima facie* case.

### 3. Exercise of Custody Rights

Finally, Petitioner was, or would have been, exercising his custody rights at the time of the removal or retention.  As noted above, Petitioner lived with S.D.S. up until S.D.S. left with Crespo to go to the shelter.  According to his testimony, he cared and provided for S.D.S., at least to some degree, up until March 2021.  He sometimes took her to school, went rollerblading with her, and took her to ballet classes.  He has also had a say in determining where S.D.S. resides.  By seeking her return to Portugal, Petitioner is exercising his right to have a say in A.D.C.'s place of residence.  Petitioner also testified that, but for the retention, he would have been taking care of, and providing for, A.D.C. in the same manner he did with S.D.S.  Although Crespo testified that she spent more time with S.D.S. in Portugal, there is no real dispute that he cared for and provided for S.D.S. to some degree.  On this record, the Court therefore finds that Ascanio was, or would have been, exercising his custody rights at the time of the removal or retention.

Since Petitioner has established a *prima facie* case of wrongful removal by a preponderance of the evidence, the Convention requires that both children be returned to Portugal unless Respondent is able to establish one of the enumerated affirmative defenses.

B. **RESPONDENT'S AFFIRMATIVE DEFENSES**

"The return remedy is not absolute." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 5 (2014). The Convention recognizes a number of narrow defenses to, or exceptions from, returning a child to her country of habitual residency.  *See Baran v. Beaty*, 526 F.3d 1340, 1344–45 (11th Cir. 2008).   Relevant here, a court may decline to order the return of the children if Respondent is able to establish that: (i) there is a grave risk that the return of the children would expose them to physical or psychological harm or otherwise place them in an intolerable situation; (ii) the Petitioner consented, or subsequently acquiesced, to the removal or retention of the children; or (iii) Petitioner was not actually exercising the custody rights at the time of removal or retention.  Hague Convention, art. 13, 20.  The Court may also decline to order a return when a child objects to being returned.  Hague Convention, art. 13.  The Court addresses each of Respondent's asserted affirmative defenses in turn.

1. **Grave Risk**

Respondent asserts that both children face a grave risk of physical and psychological harm or being placed in an intolerable situation if they are returned to Portugal.  Under Article 13(b) of the Convention, a court is not bound to order the return of a child if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Hague Convention, art. 13(b).  "[A] respondent who opposes the return of the child has the burden of establishing" the affirmative defense of grave risk of harm "by clear and convincing evidence."  22 U.S.C. § 9003(e)(2)(B). "Clear and convincing evidence is a demanding but not insatiable standard, requiring proof that a claim is highly probable."  *Nejad v. AG, Georgia*, 830 F.3d 1280, 1289 (11th Cir. 2016). For this exception to apply, the risk of harm must be grave, not merely serious.  *See Gomez v. Fuenmayor*, 812 F.3d 1005, 1012 (11th Cir. 2016).

Respondent has not established, by clear and convincing evidence, that there is a grave risk of harm if the children are returned to Portugal, or that they would be placed in an intolerable situation.  Respondent testified that Petitioner has been abusive to both her and S.D.S.   Domestic violence suffered by a respondent can be relevant to a grave risk determination.  "If, for example, Ms. [Crespo] could demonstrate that returning to [Portugal] would put her own safety at grave risk, [this] court could consider whether this is sufficient to

9

show that the child too would suffer psychological harm or be placed in an intolerable situation." *See Abbott v. Abbott*, 560 U.S. 1, 22 (2010).

Respondent testified that Petitioner was physically, verbally, sexually, and emotionally abusive towards her over the course of their marriage. She also testified that some of the violence occurred while she was pregnant, and sometimes in front of S.D.S. Crespo testified that she reported the abuse on two occasions, one of which immediately preceded her move to a shelter and then out of Portugal. Respondent also testified that the Petitioner has threatened to harm her, himself, and her parents.

A court may consider a child's testimony in "determining whether the child would face a grave risk of harm if returned." *Romero v. Bahamonde*, 857 Fed. App'x 576, 581 (11th Cir. 2021) (citing *Blondin v. Dubois*, 238 F.3d 153, 166 (2d Cir. 2001)). During her *in camera* examination, S.D.S. testified that, although she had observed her mum crying a number of times when her parents fought, she did not know if Petitioner had ever hit her mum because she had never observed that. She did, however, hear them fighting and this made her feel bad. She testified that although her dad had never hit her and she was not generally afraid of him, she was afraid that he would hurt her when he did not allow her to speak to her maternal grandparents. Petitioner, according to S.D.S., stopped allowing her to speak with her maternal grandparents when her parents started fighting. Notably, she also testified that she did not wish to be reunited with her father because she did not want her parents to resume their fighting. However, she further explained, she would be alright with her mum and dad being in the same place again as long as they no longer fought.

The Court is mindful of the sensitive nature of domestic violence allegations and experiences. Nonetheless, the contents of Respondent's testimony, especially when considered together with S.D.S.'s testimony, do not constitute clear and convincing evidence that the children face a grave risk of harm if they are returned to Portugal. Evidence of S.D.S.'s emotional distress due to her parents' fighting is also insufficient to establish clear and convincing evidence of a grave risk of harm or the risk that the children will be placed in an intolerable situation. The Court therefore finds that Respondent has not met her burden of establishing this exception.

Moreover, even if Respondent's testimony on the domestic violence that occurred in the home was sufficient to serve as clear and convincing evidence of grave risk of harm, the

Court is satisfied that any such risk can be mitigated by the appropriate authorities and institutions in Portugal while the courts in Portugal make a custody determination.

**2. Consent**

Respondent has also not met her burden of establishing consent or acquiescence. "[A] respondent who opposes the return of the child has the burden of establishing" the affirmative defense of consent or subsequent acquiescence by "a preponderance of the evidence." 22 U.S.C. § 9003(e)(2)(B). According to Respondent, Petitioner consented or acquiesced to the move because he "never explicitly stated that moving to the United States was out of the question" whenever Respondent broached her desire to move to the United States with the children. Am. Answer ¶¶ 106, 110. Respondent also asks that consent and acquiescence be found based on Petitioner's alleged refusal to speak with S.D.S. for two months. *Id.*

For one, Respondent presented no evidence that Petitioner ever consented, or subsequently acquiesced, to the children's removal to, or retention in, the United States. His alleged failure to unequivocally tell his wife that her desire to move to the United States was out of the question does not establish that he, more likely than not, assented to the move. The same is true regarding the account that he refused to speak to S.D.S. for two months. Moreover, Petitioner testified that he did not give his consent to S.D.S. leaving Portugal; nor did he consent to her moving permanently to the United States. He also testified that the topic of Crespo moving to the United States with the children was never discussed. Consequently, the Court finds that this exception has not been established.

**3. Exercise of Custody Rights**

Respondent asserts that Petitioner abandoned, or was not exercising, his custody rights as to A.D.C. primarily because Petitioner did not name her in the divorce proceedings and also did not include her in the parental responsibility action in Portugal. Am. Answer ¶¶ 72–78. Respondent also testified that Petitioner has consistently denied A.D.C. and has made no attempt to ask about her.

According to Petitioner, however, he initially named only S.D.S. in the proceedings, and then later attempted to include A.D.C. but was told he could not add an unborn child to the proceedings. He also testified that he filed an application for return with the Portuguese Central Authority. That application, which was submitted before A.D.C. was born, included

11

only S.D.S.   According to Petitioner, his understanding of the law at that time was that he could not include an unborn child in his return application.

He further testified that, after A.D.C. was born, he was unable to add her to the proceedings in Portugal because his name was not on A.D.C.'s birth certificate.   Both Petitioner and Respondent spar on the issue of who is in the better position to include Ascanio's name on the birth certificate.   Respondent's Portuguese lawyer testified that Ascanio could have taken the Florida birth certificate to the proper Portuguese authorities to have his name added, and then used that updated certificate to include A.D.C. in the Portuguese proceedings.   Respondent's Portuguese lawyer also testified that, although Ascanio is presumed to be A.D.C.'s father, Portuguese law affords him 290 days (until April 2022) to add his name to the birth certificate in Portugal.  Petitioner's Portuguese lawyer, on the other hand, did not explicitly opine on this issue.  He did state that he believed that it is easier for Crespo to amend the birth certificate to include Ascanio's name.

In any event, whatever Ascanio's reasons are for not having yet added his name to the birth certificate in Portugal, he provided testimony, which the Court found credible, that he attempted to add A.D.C. to the proceedings before and after her birth.   In addition, after Crespo's departure to the shelter, Ascanio sent her emails inquiring about the well-being of S.D.S., A.D.C., and Crespo.  He also asked Crespo if she needed money.  Crespo no longer had access to the email at that time, so she never received the messages.   On this record, the Court is unable to conclude that Ascanio, more likely than not, abandoned, was not, or would not have been, exercising his custody rights as to A.D.C.

### 4.  Child's Objection

Pursuant to Article 13 of the Convention, a court may "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views."  Hague Convention, art. 13.

Although S.D.S. is only eight years old, she was remarkably candid and communicated well throughout her examination.  She appeared to understand the importance of testifying honestly and did not appear to be unduly influenced by either of her parents. When asked specifically about returning to Portugal, S.D.S. said she did not wish to return to Portugal.  She does not wish to return to Portugal because she enjoys her mum's family in the

United States.  She particularly enjoys having an aunt who often buys her presents here in the United States.  S.D.S. also testified that, before coming to the United States, she liked living with her dad.  She said they would play and cook pancakes together.  She, however, testified that she no longer feels this way since having been here.

S.D.S. testified that she enjoys having many friends at school here in the United States; despite not being particularly fond of her mathematics teacher.  Although she seemed generally indifferent about school, she explained that she prefers schooling in the United States over schooling in Portugal because: (i) she receives much less homework here in the United States than she did in Portugal; and (ii) school ended around 6:00p.m. in Portugal; whereas here, she enjoys school ending at 2:00p.m.

Although the Court is deeply sympathetic to S.D.S.'s wishes, the Court finds that her objection to returning to Portugal amounts only to a preference for one school over another, and for one set of relatives over another.  Consequently, the Court concludes none of S.D.S.'s objections are the kind of particularized objections that would be sufficient to support the mature child objection defense.  And, even if they were sufficiently particularized to invoke the exception, the Court exercises its discretion to order S.D.S.'s return because doing so furthers the aims of the Convention; one of which is to ensure that custody rights under the law of a Contracting State are effectively respected.

### III.   CONCLUSION

For the reasons stated above, the Court finds that Petitioner has established a *prima facie* case for return, and Respondent has not established any of the asserted exceptions.  Accordingly, it is **ORDERED and ADJUDGED** as follows:

1. Petitioner's Petition for the Return of S.D.S. and A.D.C. is **GRANTED**.
2. Both S.D.S. and A.D.C. shall be returned to Portugal at a date and time agreed upon by both Parties, but within 45 days from the date of this Order.
3. Upon agreement, the Parties shall file a notice with the Court; with that notice, the parties may request the return of the children's passports and travel documents.
4. Respondent shall not, absent leave of this Court, remove the children from the Southern District of Florida pending their return to Portugal.

13

5.  Counsel for Respondent shall file a notice with the Clerk of Court immediately upon S.D.S. and A.D.C.'s arrival in Portugal indicating that Respondent has fully complied with the terms of this Order.

6.  No award of attorneys' fees or other costs will be made at this time.  The Court will consider any separate request for attorneys' fees that Petitioner may file, upon motion properly made.

**DONE and ORDERED** in Chambers at Miami, Florida this 4th day of November 2021.


*Marcia G. Cooke*

MARCIA G. COOKE
United States District Judge


Copies furnished to:
*John J. O'Sullivan, Chief U.S. Magistrate Judge*
*Counsel of Record*

14